Socorro DURAN–GARCIA, Appellant,

v.

Marcus T. NEELLY, in his official capacity as District Director of the Immigration and Naturalization Service, Appellee.

No. 16610.

United States Court of Appeals
Fifth Circuit.

July 16, 1957.

Albert Armendariz, El Paso, Tex., for appellant.

Holvey Williams, Asst. U. S. Atty., El Paso, Tex., for appellee.

Before HUTCHESON, Chief Judge, and TUTTLE and CAMERON, Circuit Judges.

TUTTLE, Circuit Judge.

This is an appeal from a judgment of the district court decreeing that appellant is entitled to no relief from an order of deportation. Except as indicated specifically below the facts are not in dispute.

Appellant is a young woman of Mexican birth and nationality whose legal name is Socorro Duran-Garcia, but who is and was generally known as Conception or Consuelo. She was born on July 15, 1931. Her mother's name is Belen Garcia de Duran.

On November 18, 1949, appellant applied for and was issued a local crossing

card at El Paso, Texas, in the name of Conception Duran Garcia, her date of birth being given as December 8, 1930, and the mother's name as Belen Garcia. Though this document did not entitle appellant to work in the United States, and she had stated that she desired it for the purpose of shopping here, she soon sought work as a domestic, and found such employment about February 1950. On June 2, 1950, appellant was found working in the United States and was consequently relieved of her local crossing card and was granted the privilege of voluntary departure to Mexico in lieu of deportation.

On August 31, 1951, appellant, still using the given name Conception, again applied for local crossing privileges into the United States. This was denied to her for reasons not stated in the record.

On May 27, 1953, appellant applied for and was issued a local crossing card in the name of Socorro Duran-Garcia, date of birth July 27, 1931, mother's name Victoria Garcia. She also stated under oath that she had never been granted a voluntary departure from the United States. The reason given for wanting to come to the United States was: "to shop & visit," but appellant almost immediately started to look for work and soon secured occasional employment as a domestic in El Paso.

On November 22, 1955, appellant applied for, and on the next day she received an immigration visa to the United States. Nothing is shown in the record about the facts stated in that application, except that the visa was issued in the name of Socorro Duran-Garcia. Using this visa appellant has established her residence in the United States and has resided here continuously except for short visits to Mexico; her latest entry into the United States occurred on January 9, 1956.

On January 12 and 13, 1956, investigators of the Immigration and Naturalization Service took statements from the appellant (which, however, are not part of this record) and on January 30th the proceedings here under review had their genesis in a warrant charging that appellant was subject to the deportation pursuant to 8 U.S.C.A. § 1251(a) (1) as an alien who at the time of entry, given as January 9, 1956, was excludable under the provisions of 8 U.S.C.A. § 1182(a) (19) because she had procured a visa or other documentation by fraud or by willfully misrepresenting a material fact.

On March 1, 1956, appellant was examined by another investigator, acting as Examining Officer. Appellant was not represented by counsel and apparently was not advised that she could be, but she requested to and did have a friend present at the hearing. Since appellant does not speak English the examination was conducted in Spanish, with the Examining Officer acting as interpreter and recording the questions and answers in English; the bilingual friend was satisfied that the hearing was correctly recorded. Appellant stated that the use of the name Conception and the incorrect birth date on the 1949 application were due merely to the fact that she had up to then never seen her official birth certificate, though later she admitted that her mother had by that time already informed her of her correct given name and that therefore she had "lied [sic] * * * for the purpose of securing the local crossing privilege" in giving the name Conception. The slight mistake in recording her correct birthday in 1953 she attributed to the immigration official. She admitted that she had deliberately lied in and for the purpose of securing her 1953 crossing card in that she had falsely stated the name of her mother and in that she had stated that she had never been granted the voluntary departure privilege; she also stated that she had secured the card to work or look for work, rather than for its stated object.[1] After having the statutory defini-

---

1. "Q. For what purpose did you secure the local crossing card at El Paso, Texas, on May 27, 1953, under the name of Socorro Duran-Garcia? A. I secured it to work in the United States. Actually, I

tion of perjury read to her [2] she stated that she had committed perjury in obtaining her card in 1953, and also in obtaining her immigration visa in 1955, in that she had then sworn that she had never been deported, etc. from the United States and that she had never been known by any other given name than Socorro.[3]

On March 8, 1956, a Show Cause order was served on appellant requiring her to answer the charge that she was deportable because of the fraud in obtaining her 1953 border crossing card. On March 16th and on April 9th a hearing was conducted before a Special Inquiry Officer of the Immigration and Naturalization Service. Appellant was both times advised of her right to counsel but stated that she had no money for one; on the first date she did have a friend present. At that hearing the Examining Officer introduced into the record the sworn statement that had been taken on March 1st. Neither the appellant nor the Examining Officer introduced any further relevant evidence. On the basis of that record the Special Inquiry Officer issued his ruling, including Discussion, Findings of Fact, Conclusions of Law, and Order of Deportation. The Discussion recited in general the facts outlined above and stated that the 1953 card had been obtained by means of misrepresentations which prevented the Immigration Department from making a full and proper inquiry into appellant's background, and thus the charge made in the Show Cause order was sustained; it was also stated that there was insufficient evidence in the record to show fraud in obtaining the 1955 visa. The Findings of Fact specified the following facts to have been falsely stated in the 1953 application: (1) denial of the earlier grant of voluntary departure; (2) mother's name given as Victoria; (3) giving the purpose of the proposed trips to the United States as shopping and visiting.

Appellant, represented by her present counsel, took an appeal to the Board of Immigration Appeals of the Department of Justice. The Board dismissed the appeal, principally on the ground of the misrepresented purpose, citing the opinion of this Court in Reyes v. Neely, 228 F.2d 609.

Appellant then brought this action under the Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq., alleging, *inter alia*, that all the reasons for which the deportation order had been issued had already been examined and resolved in favor of the appellant at the time that she had obtained her immigration visa in 1955, and therefore prayed that the court set a hearing to review the order of deportation and that upon such hearing the order be set aside. After appellee had answered a hearing was held at which appellant alone testified, over a Government objection against any evi-

---

did not have work, but I secured the card to come to El Paso to look for work.

"Q. How long was it after you secured this local crossing card that you began to work in El Paso? A. I began almost immediately to look for work. At first I did not have steady work, but worked one or two days a week as a domestic in El Paso.

"Q. Then, is it true that you secured the local crossing card on May 27, 1953, for the purpose of looking for work and of working in the United States and that after having secured the card, you did immediately look for work and accept work where you could find it? A. Yes.

"Q. Is it not also true that you knew that your local crossing card was not valid to look for work or to work in the United States? A. Yes, I knew that."

**2.** 18 U.S.C.A. § 1621.

**3.** This is the only information in the entire record about the circumstances of the 1955 application; the questions and answers were as follows:

"Q. Did you realize you were under oath when you signed and swore to this application for an immigrant visa before the American Consul on November 22, 1955? A. Yes.

"Q. Do you admit that you committed the crime of perjury before the American Consul on that date when you told him that you had never been deported, excluded, or removed from the United States at Government expense and that you had never been known by any other name than Socorro Duran-Garcia? A. Yes, because I was afraid he would not give me my visa."

dence from outside of the record of the administrative proceeding. She said that she had been questioned at the March 1st hearing in spite of her request for time to look for counsel[4] and that she had not stated that she actually had intended to use the 1953 card in order to work or to look for work but had said that she had intended to use the card to obtain "letters so I can come over legally";[5] she indicated, however, that she had signed the (English) record of the hearing after it had been read back to her in Spanish. She was not cross-examined and neither party introduced any further evidence, except for the complete record of the administrative hearing. Counsel for both parties then argued their respective positions orally after which the trial court ruled that it was denying all relief requested by the appellant. Subsequently the court issued a formal judgment.

On this appeal appellant raises the following points: (1) that the district court erred in denying appellant a review of the administrative hearing; (2) that the court erred in denying the prayer to set aside the order because: (a) the alleged fraudulent statement on which the deportation order was primarily based and sustained, that relating to appellant's intentions in obtaining the 1953 card, was not proven to be false because the testimony at the trial showed that the apparent admission of falsehood at the March 1st hearing was due to misunderstanding or mistranslation; (b) that no misconduct prior to the lawful obtaining of the last valid visa can be raised in a deportation proceeding.

The first point appears to be a mere verbal quibble based on the trial court's statement that *all* relief requested by appellant was being denied, which statement appellant interprets to mean that the prayer that the administrative determination be reviewed was also denied. However, it appears clear from the record and in the recitals of the formal judgment itself[6] that the trial court really meant that upon review of the record all consequent relief is denied. Appellant evidently introduced before the

4. The transcript of that hearing discloses no discussion whatsoever about counsel, but appellant did have a bilingual friend present.

5. "Q. Now, I notice that on Page 4 of a statement which is part of the record in this case, according to the record you were asked, 'For what purpose did you secure the local crossing card at El Paso, Texas, on May 27, 1953, under the name of Socorro Duran-Garcia?' The answer as given by you, according to this record, was: 'I secured it to work in the United States. Actually, I did not have work, but I secured the card to come to El Paso to look for work.' I will ask you if that is the way that you answered that question? A. No. I told them I came with the purpose of getting letters so I could come over legally.

"Q. And that was your answer to that question, is that right? A. That is right.

    \*     \*     \*     \*     \*

"Q. Do you remember their telling you at any time reading the question and answer as we have read it to you, that is, that they asked you what was your purpose and you answered 'to work in the United States', do you remember that particular answer? A. Yes, they did."

6.           *"Judgment*

"On this the 16th day of November, 1956, the Court brought the captioned case on to be considered without the aid of a jury. The plaintiff appeared in person and through her attorney of record and the defendant appeared through Wm. Monroe Kerr, Assistant United States Attorney; whereupon all matters in controversy were submitted to the Court for determination. After considering all of the evidence, including the record made in deportation proceedings, the pleadings and the argument of counsel, the Court is of the belief that the plaintiff is entitled to no relief.

"It is, therefore, Considered, Ordered, Adjudged and Decreed by the Court that the defendant in this action have, and he hereby is given judgment denying the plaintiff any relief, and for his costs of court.

"Done at El Paso, Texas.

                    "R. E. Thomason,
                    "Presiding Judge.

"Approved as to form
"Albert Armendariz,
"Attorney of record for plaintiff.
"Wm. Monroe Kerr,
"Assistant United States Attorney,
"Attorney for defendant."

district court all the testimony she wanted to, there being no indication that she would have been precluded from presenting other relevant evidence, and she made no objection to the consideration of appellee's only evidence, the record of the hearings. Shaughnessy v. Pedreiro, 349 U.S. 48, 75 S.Ct. 591, 99 L.Ed. 868, on which she relies, requires no more.

■ Appellant asserts that on the basis of the trial record it is clear that the apparent admission during the March 1st hearing that she had misstated her purpose for wishing to come to the United States in 1953, is due to a misunderstanding or mistranslation on the part of the Examining Officer. However, we cannot hold that the trial testimony, considered in conjunction with the statutes in question, compels a finding for appellant on this issue. At the end of the March 1st hearing appellant's bilingual friend affirmed that appellant's answers had been truly recorded, and at the trial, in response to her own counsel's question, appellant seemingly admitted that at the hearing the recorded answers had been read back to her in Spanish before she signed the statement. Moreover, even if her answer at the hearing had been that claimed at the trial it would still not show that her 1953 answer had been truthful. The purpose of obtaining letters for a subsequent legal entry, while not improper, is not that which was declared, i. e. to shop and visit. But aside from selfserving declarations as to her then intention, the Immigration officials as well as the trial court were entitled to draw conclusions as to her real intention in 1953 from the fact that she almost immediately began to look for work and accepted part time employment pending the possibility of "steady work," especially if considered in conjunction with her previous violation of the terms of a similar crossing card. It is thus unnecessary for us to pass on appellee's objection, overruled by the trial court, that the court should have received no evidence except for the hearing record.

■ Another issue was raised by appellant in her appeal to the Board of Immigration Appeals, which appears to be implicit in this appeal too: did the misrepresentations charged involve any "material" fact, and, if not, does 8 U.S. C.A. § 1182(a) (19) still require that she be considered excludable? We have little doubt that a misrepresentation as to a visitor's purpose in entering, which intention, if known, would have caused her to be considered and processed as an immigrant or perhaps rejected altogether, is material. See, e. g. Sleddens v. Shaughnessy, 2 Cir., 177 F.2d 363; United States ex rel. Feretic v. Shaughnessy, 2 Cir., 221 F.2d 262, certiorari denied 350 U.S. 822, 76 S.Ct. 49, 100 L. Ed. 735; both cited with approval by this Court in Reyes v. Neely, supra, 228 F.2d at page 611. We view similarly the concealment of the previous quasi deportation proceedings, which if known would perhaps not automatically have required exclusion but which would, in this case, have suggested further inquiry into appellant's actual motives. The false statement of the name of appellant's mother was admittedly calculated to and could frustrate an inquiry into appellant's past, particularly since the 1953 application "legitimately" showed a different name and birth date for appellant than had been stated in 1949—the other changes not being fraudulent since they are claimed to have resulted from a discovery by appellant of the true facts during the interval. Though perhaps a complete inquiry would have resulted in a discovery of no other material facts than the previous involuntary departure, it has been held that any concealment of information that tends to frustrate the proper official investigations is grounds for excludability under the statute, particularly if the deception is directed primarily against the United States. Landon v. Clarke, 1 Cir., 239 F.2d 631, distinguishing United States ex rel. Leibowitz v. Schlotfeldt, 7 Cir., 94 F.2d 263, along lines here also applicable.

■ We come now to appellant's final point, that no deportation may be based

on activities that antedate the granting of a properly issued visa. Here it is clear that the deportation proceedings are entirely based on the alleged misstatements in the 1953 application, for the Special Inquiry Officer found insufficient evidence as to fraud in the 1955 application, and indeed such evidence in this record is insufficient, nor was the Show Cause order based on anything but the 1953 application. Appellant cites Berrebi v. Crossman, 5 Cir., 208 F.2d 498, to support her proposition, but that case was predicated on entirely different statutory provisions. The excludability based on fraud in obtaining entry documents is new to the Code and in the years since 1952 apparently no case directly in point has been decided. The question is whether the statute requires the deportation of an alien who at one time in the past had obtained a visa by means of materially fraudulent statements but who subsequently secured another visa untainted by fraud and who now is in the United States pursuant to an entry under the legitimate document. The pertinent portions of the statute read as follows:

"§ 1251. *Deportable aliens—General classes*

"(a) Any alien in the United States (including an alien crewman) shall, upon the order of the Attorney General, be deported who—

"(1) at the time of entry was within one or more of the classes of aliens excludable by the law existing at the time of such entry; * * *." 8 U.S.C.A. § 1251(a) (1).

"§ 1182. *Excludable classes of aliens; non-applicability to certain aliens; waiver of requirements; parole of aliens; report to Congress; suspension of entry by President*

"(a) Except as otherwise provided in this chapter, the following classes of aliens shall be ineligible to receive visas and shall be excluded from admission into the United States:

\* \* \* \* \* \*

"(19) Any alien who seeks to procure, or has sought to procure, or has procured a visa or other documentation, or seeks to enter the United States, by fraud, or by willfully misrepresenting a material fact; * * *." 8 U.S.C.A. § 1182 (a) (19).

It is clear that the words: "any alien who * * * has procured a visa * * * by fraud, or by willfully misrepresenting a material fact" permit, if they do not require, the interpretation urged by the Government. The only doubt that can be cast on this construction is the background of the statute.[7] This crucial point was not actually discussed in either brief, and in the absence of any other relevant aids to interpretation we incline toward and adopt the literal reading of the statute.

We should also point out that appellant admitted having committed perjury in connection with the 1953 application,

---

7. The legislative history is actually somewhat inconclusive. In its original, comprehensive report on which the 1952 Act was eventually largely based, the Senate Judiciary Committee recommended that there should be added to the list of excludable aliens those who had obtained their entry documents by fraud. The context and the language suggest that they had in mind aliens who wished to enter or who had entered and were still in the United States on these fraudulent documents. Thus it was said:

"Under various provisions of the immigration laws, aliens who arrive at a port of entry without proper documents or without any documents may be denied admission. The subcommittee feels that such aliens should be specifically designated in the excludable classes as such. Accordingly, those classes will include any alien who seeks to procure, has sought to procure, or has procured a visa or other documentation by fraud, false claim, or misrepresentation of fact; * * *."
and in summarizing:
"Those recommendations on the excludable classes, in general, will include aliens who are * * * (9) *in possession* of improper or fraudulently obtained documents, * * *." (Emphasis added.) "The Immigration and Naturalization Systems of the United States,"

after having that crime, as set forth in 18 U.S.C.A. § 1621, explained to her. Although not charged in the Show Cause order, she thus appears to have been excludable at all times since 1953 by virtue of 8 U.S.C.A. § 1182(a) (9), as having admittedly committed a crime involving moral turpitude. United States ex rel. De La Fuente v. Swing, D.C.S.D.Tex., 146 F.Supp. 648, affirmed, 5 Cir., 239 F. 2d 759.

The judgment of the district court is affirmed.

Report of the Senate Committee on the Judiciary, S.Rep. No. 1515, 81st Cong. 2nd Sess., pp. 375, 412–13.

The reports on the final drafts of the Act are not helpful in determining the intention of Congress as to this point. They only indicate that Congress did not wish to penalize aliens whose misrepresentations stemmed from a fear of being forcibly repatriated to their former homelands. See H.R.Rep. 1365, 82nd Cong., 2nd Sess., reprinted in 1952 U.S.Code Cong. & Admn.News, pp. 1653, 1704, and Conference Report No. 2096, 82nd Cong., 2nd Sess., id. at 1753, 1754.

It should be noted that the section of the Criminal Code that punishes fraud committed in obtaining a visa appears to have no restrictions, except those that flow from statutes of limitations, as to whether the fraudulent document was used in the latest entry or indeed in any entry; see 18 U.S.C.A. § 1546.